UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| THOMAS J. WESTGARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 1:17-cv-00239-JMS-TAB |
| | ) |
| JOHN KENNARD, in his capacity as Designee of the Brown County Health Officer, NORMAN OESTRIKE MD, in his capacity as the Brown County Health Officer, THEODORE ADAMS, in his capacity as the elected prosecutor of Brown County, SCOTT D. SOUTHERLAND, in his capacity as the elected Sheriff of Brown County, | ) |
| | ) |
| Defendants. | ) |

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

This case arises from a dispute regarding a piece of property in Brown County, Indiana. *Pro se* Plaintiff Thomas Westgard has filed suit against various county officials, including John Kennard, an environmental specialist with the Brown County Health Department; Norman Oestrike, the Health Officer of the Brown County Health Department; Theodore Adams, the Prosecutor of Brown County; and Scott Southerland, the Sheriff of Brown County.[1] Mr. Westgard alleges that the Defendants have violated and will continue to violate his rights under the United States Constitution and 42 U.S.C. § 1983 by entering his property without a warrant and without his consent. Presently pending before the Court is Mr. Westgard's Motion for Preliminary

---

[1] The Court notes that while Mr. Westgard proceeds in this Court *pro se*, he states that he was formerly licensed to practice law in Illinois and did so for 15 years in Chicago. [Filing No. 1 at 7.]

1

Injunction. [Filing No. 5.] For the reasons described below, the Court denies Mr. Westgard's Motion.

# I.
## BACKGROUND

This dispute centers around a 15-acre parcel of property located in Brown County, Indiana. [Filing No. 1 at 2.] The property is undeveloped except for some fencing and three "rough shacks," two of which were built by Mr. Westgard. [Filing No. 1 at 2.] Mr. Westgard stores items on the property, occasionally camps there overnight, and engages in activities such as foraging for mushrooms and persimmons. [Filing No. 1 at 2.] Mr. Westgard alleges that he was initially a tenant on the property, which was wholly owned by Anders Jorgensen, but on December 3, 2015, Mr. Jorgensen conveyed to Mr. Westgard a 10% interest in the property. [Filing No. 1 at 9.]

Mr. Westgard alleges that on May 5, 2015, he did some agricultural work on the property and spent that night in one of the shacks. [Filing No. 1 at 5.] The following morning, on May 6, 2015, Health Officer Kennard drove onto the property through an unlocked gate with another health department employee and two Brown County sheriff's deputies. [Filing No. 1 at 5.] Mr. Westgard alleges that "No Trespassing" signs were prominently displayed at the entrance to the property. [Filing No. 1 at 6.] Mr. Kennard drove down the driveway through a wooded area approximately one quarter of a mile and came to a stop. [Filing No. 1 at 6.] According to Mr. Kennard, he "observed two shacks from a distance, but did not deem the shacks to be livable." [Filing No. 24-1 at 3.] Mr. Kennard also attests that "[a]t no time did [he] or any other health officials enter the shacks on the Subject Property or even get close enough to look into a window or door. No one inspected any personal property or belongings that were on the property." [Filing No. 24-1 at 3.]

According to Mr. Westgard, he approached the vehicles and asked Mr. Kennard whether he had a warrant (presumably to enter the property). [Filing No. 1 at 6.] Mr. Westgard alleges that Mr. Kennard responded that he had a warrant, but that a copy of it would have to be obtained from the Brown County prosecutor's office. [Filing No. 1 at 6.] Mr. Kennard expressed concerns regarding whether a family was living on the property in a tent (as had previously been observed), and whether any associated sewage and trash were being properly disposed of. [Filing No. 1 at 6.] Mr. Westgard stated that, as Mr. Kennard could observe, the tent had been removed, and therefore there were no longer any enforcement issues. [Filing No. 1 at 6.] Mr. Westgard does not allege that Mr. Kennard either exited the vehicle or approached or entered any of the property's structures.

Later that day, Mr. Westgard visited the Brown County prosecutor's office in order to obtain a copy of the warrant. [Filing No. 1 at 7.] Mr. Westgard spoke to prosecutor Adams, who allegedly stated that there was no warrant regarding Mr. Kennard's entry on the property. [Filing No. 1 at 7.] Mr. Westgard alleges that Mr. Adams stated that:

> Kennard, Adams, and Southerland engaged in an official policy and practice wherein Kennard issues periodic emails to Adams and Southerland. Said emails advise Adams and Southerland that Kennard intended to visit certain properties where he expected property owners and/or tenants to object to Kennard's presence in or on their property. Kennard requests a sheriff's escort, and after approval by Adams, Southerland assigns sheriff's deputies to intimidate residents and owners who object to warrantless, nonconsensual invasions of their homes and property.

[Filing No. 1 at 7.] Upon learning of this "invasion," Mr. Westgard became "outraged and furious." [Filing No. 1 at 7.] Mr. Westgard informed Mr. Adams that the property entries were "criminal acts," and that they "were obligated to seek a search warrant before they could enter private property." [Filing No. 1 at 7.] Later that afternoon, Mr. Kennard informed Mr. Westgard that his authority to enter the subject property was pursuant to Indiana statute and the Brown County septic ordinance. [Filing No. 1 at 8.] Mr. Westgard and Defendants then exchanged emails

3

over the next several months regarding the legality of the entry on the subject property. [Filing No. 1 at 7-9.]

On January 17, 2017, Mr. Kennard emailed Mr. Jorgensen and Mr. Westgard a notice stating that the Brown County Health Department would be visiting their property during the week of January 30, 2017 for another inspection. [Filing No. 1 at 10.] In response to that letter, Mr. Westgard visited Mr. Adams' office. [Filing No. 1 at 10.] Mr. Adams was not there, so Mr. Westgard left a handwritten note stating that Mr. Kennard had no legal right to enter the property, and that any sheriff assisting in such an entry would be an accessory to trespass and burglary. [Filing No. 1 at 10.] Mr. Adams responded to that note by email, stating:

> I am in receipt of your letter. Without researching this area of the law again, I am certain I have previously cited statutory authority giving the Health Department authority to enter one's property for an inspection with proper notice (Title 16, I believe). I am sure you can find the statute. I cannot legally conclude that any officer would be committing a prima facie crime, least of all burglary. I know nothing (outside of what you have informed me) of this planned inspection, nor would any ordinance violation be pursued by the Brown County Prosecutor's Office. Our office would only become involved if a criminal act has been committed, such as a failure to vacate. I suggest calling either John Kennard pursuant to the notice (and the email, below) or the Health Department's attorney, John Reames, to voice any concerns.

[Filing No. 1 at 10.] Mr. Westgard then contacted Mr. Kennard and the Health Department, objecting to the proposed visit to his property. As far as the Court has been informed, that proposed January visit never occurred. Regarding any future visit to the property, Mr. Kennard attests that "[a]ny future inspection would similarly consist of driving onto the Subject Property, using the driveway, briefly driving around the Subject Property, and examining the conditions on the land. We would specifically look for signs anyone was living on the property, trash and debris left out in the open." [Filing No. 24-1 at 3.]

On January 25, 2017, Mr. Westgard filed a Complaint in this Court asserting claims against several Brown County officials: Health Officers Kennard and Oestrike; Prosecutor Adams; and

Sheriff Southerland.[2]  Mr. Westgard alleges violations of 42 U.S.C. § 1983 and the First, Third, Fourth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.  [Filing No. 1 at 11-19.]  He also alleges violations of Indiana Code Sections 36-7-8-3 and 16-19-3-6.  [Filing No. 1 at 16-17.]  Mr. Westgard requests a preliminary injunction enjoining Defendants from entering the property as proposed on January 17, 2017; a permanent injunction prohibiting Defendants from entering the property without a warrant; a declaratory judgment that Defendants' enforcement of certain statutes, rules, and ordinances violates the United States Constitution; and an order "that Defendants shall establish a legal process by which Plaintiff and those similarly situated shall receive notice and an opportunity to be heard before a warrant is issued for search of their persons and property by Defendants."  [Filing No. 1 at 19.]

This Court screened the Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B).[3]  [Filing No. 15.]  The Court dismissed all claims against Defendants in their individual capacities, and it dismissed all claims based on the First, Third, Eighth, Ninth, and Fourteenth Amendments.  [Filing No. 15 at 3-7.]  The Court also declined to exercise supplemental jurisdiction over Mr. Westgard's state law claims.  [Filing No. 15 at 6.]  Therefore, Mr. Westgard is left with only an official capacity claim against Defendants Kennard, Oestrike, Southerland, and Adams for violating his rights under the Fourth Amendment and 42 U.S.C. § 1983.[4]

---

[2] Westgard also initially named Jerome Adams, M.D., Indiana State Health Commissioner, as a defendant.  The Court dismissed all claims against Dr. Adams in its screening order, described in more detail below. [Filing No. 15 at 4.]

[3] The Court issued an amended screening order on July 7, 2017.  [Filing No. 39.]

[4] Westgard raises a brief argument regarding the issuance of a preliminary injunction relating to Count Six of his Complaint, based on the alleged violation of an Indiana statute.  [Filing No. 6 at 4.]  The Court dismissed this claim in its screening order, [Filing No. 15 at 6], and therefore no injunctive relief may be awarded as to this claim.

5

Presently pending before the Court is Mr. Westgard's Motion for Preliminary Injunction, [Filing No. 5], which Defendants oppose, [Filing No. 22; Filing No. 24].  That Motion is now ripe for the Court's review.

## II.
### PRELIMINARY INJUNCTION STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (citation omitted).  "Preliminary relief is properly sought only to avert irreparable harm to the moving party." *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006).  Because the merits of the underlying litigation are not at issue at this stage, "the reluctance to disturb the status quo prior to trial on the merits is an expression of judicial humility . . . [that] enables the court to stay relatively neutral in the underlying legal dispute." *Id.* at 945-46.

"To obtain a preliminary injunction, the moving party must show that his case has 'some likelihood of success on the merits' and that he has 'no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied.'" *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (quoting *Ezell v. City of Chi.*, 651 F.3d 684, 694 (7th Cir. 2011)).  "If the moving party meets these threshold requirements, the district court 'must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.'" *Stuller,* 695 F.3d at 678 (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).  "The district court must also consider the public interest in granting or denying an injunction." *Stuller,* 695 F.3d at 678.

# III.
## DISCUSSION

Mr. Westgard moves for preliminary injunction, arguing that he meets all of the requirements for its issuance. [Filing No. 5.] Defendants oppose that motion, [Filing No. 22; Filing No. 24]. The Court considers each element in turn.

### A. Likelihood of Success on the Merits

Mr. Westgard argues that he has a high likelihood of success on the merits of his claim, because the evidence submitted demonstrates that Defendants' policy and practice of warrantless searches violates the Fourth Amendment. [Filing No. 6 at 4.] Defendants respond that Mr. Westgard has no likelihood of success on the merits, because Defendants' activities are not prohibited by the Fourth Amendment. [Filing No. 24 at 9.]

The Fourth Amendment provides in relevant part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. The touchstone of the Fourth Amendment is reasonableness, and searches conducted without a warrant are presumptively unreasonable. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). However, not all government intrusions into private property are considered "searches" under the Fourth Amendment. As the Supreme Court has pointed out, "the antecedent question whether or not a Fourth Amendment 'search' has occurred is not so simple under our precedent." *Kyllo v. United States*, 533 U.S. 27, 31 (2001). The Supreme Court has concluded, for example, that the visual observation of a property "is no 'search' at all—perhaps in order to preserve somewhat more intact our doctrine that warrantless searches are presumptively unconstitutional." *Id.* at 32-33 (citing *Dow Chemical Co. v. United States,* 476 U.S. 227, 234-35 (1986) (concluding that the taking of aerial photographs of an industrial plant complex from navigable airspace does not constitute a search under the Fourth Amendment)).

7

Therefore, there are two relevant questions to any Fourth Amendment search and seizure inquiry: first, whether the activity at issue constitutes a search; and second, if it does, whether that search was reasonable. In order to determine whether an activity constitutes a search under the Fourth Amendment:

> …we have applied somewhat in reverse the principle first enunciated in *Katz v. United States,* 389 U.S. 347 (1967). *Katz* involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth—a location not within the catalog ('persons, houses, papers, and effects') that the Fourth Amendment protects against unreasonable searches. We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he 'justifiably relied' upon the privacy of the telephone booth. *Id.* at 353. As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable. *See id.* at 361. We have subsequently applied this principle to hold that a Fourth Amendment search does *not* occur—even when the explicitly protected location of a *house* is concerned—unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.' *California v. Ciraolo,* 476 U.S. 207, 211 (1986).

*Kyllo*, 533 U.S. at 32-33. Applying this framework, in *Oliver v. U.S.*, 466 U.S. 170, 178 (1984), the Supreme Court reaffirmed its prior conclusion that intrusions into open fields do not constitute searches prohibited by the Fourth Amendment. The Court reasoned that:

> …open fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance. There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields. Moreover, as a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be. It is not generally true that fences or 'No Trespassing' signs effectively bar the public from viewing open fields in rural areas.

*Id.* at 179. To put it in the terms of *Katz*, while an individual may express a subjective expectation of privacy in an open field, it is not an expectation that society is willing to recognize as reasonable. To fall within the open-fields doctrine, "the area need be neither 'open' nor a 'field' as those terms are used in common speech." *Dow Chemical,* 476 U.S. at 235-36 (internal citations and quotations

8

omitted). An open field may also be contained within private property. *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013).

The open-fields doctrine stands in direct contrast to the treatment of a home's curtilage. "The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself." *United States v. Dunn*, 480 U.S. 294, 300 (1987). The Supreme Court has long concluded that a person can have a reasonable expectation of privacy in the curtilage of his home, rendering a government intrusion into it a "search" under the Fourth Amendment. *See, e.g., Oliver,* 466 U.S. at 179. The Supreme Court has utilized a four-factor test to determine whether an area is within the curtilage of a home: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. *United States v. French*, 291 F.3d 945, 952 (7th Cir. 2002). An individual objecting to the search of a particular area bears the burden of proving a legitimate expectation of privacy in the area searched. *United States v. Ruth,* 65 F.3d 599, 604 (7th Cir. 1995).

Mr. Westgard argues that he has some likelihood of success on the merits because he has a reasonable expectation of privacy in the property intruded upon. [Filing No. 6 at 4.] He also contends that this case involves conduct that is "an exact repetition of the activity prohibited" in *Camara v. Municipal Court of the City and County of San Francisco,* 387 U.S. 523 (1967) and *See v. City of Seattle*, 387 U.S. 541 (1967). [Filing No. 6 at 4.] Defendants respond that the subject portion of property is an open field, and therefore the intrusions into the property were not "searches" subject to Fourth Amendment scrutiny. [Filing No. 24 at 10.]

Mr. Westgard takes issue with Defendants' characterization of the property inspection as implicating the open-fields doctrine. Mr. Westgard argues that an affidavit submitted by Mr. Kennard "confirms that his office has been specifically targeting, not just an *open field* at the Subject Property, but specifically 'dwellings'" and whether anyone was "living in the structures" on the property. [Filing No. 29 at 3 (emphasis in original).] Mr. Westgard contends that "Kennard's argument in his Response that he is visiting an 'open field' for purposes of curtilage analysis is specious." [Filing No. 29 at 3.]

Mr. Westgard, however, misapprehends the nature of the open-fields analysis. It is true that Mr. Kennard's affidavit specifies that he went to the property to assess "whether it appeared anyone was living on the property" and whether, if individuals were living there, they were doing so "without a septic system or other appropriate human waste disposal mechanism, [or] proper trash disposal." [Filing No. 24-1 at 2-3.] But Mr. Westgard does not allege that any Defendant entered or approached any of the structures on the property, or that any of the Defendants ever exited their vehicles, which were stopped on the driveway. Mr. Kennard attested that "[a]t no time did [he] or any other health officials enter the shacks on the Subject Property or even get close enough to look into a window or door. No one inspected any personal property or belongings that were on the property." [Filing No. 24-1 at 3.] In determining whether an activity constitutes a search or merely an incursion into an open field, what matters is the nature and configuration of the property itself and what property Defendants accessed—not the Defendants' motivations for the search, or what they were looking to find. *See Illinois v. Lafayette*, 462 U.S. 640, 646-47 (1983) (conducting inventory search of arrested person's belongings is reasonable regardless of particular officer's subjective motivations for search); *United States v. Thompson*, 139 F. App'x 724, 730 (7th Cir. 2005) (per curiam) (upholding warrantless visual inspection of trailer parked

fifty feet from defendant's home, determined to be outside the curtilage, when investigating report that methamphetamine was being produced by defendant at his home).

While Mr. Westgard takes issue with the characterization of the area searched as "open fields," he does not allege that the area at issue constitutes the curtilage of a home. But even if the Court were to construe his limited references to curtilage as such an allegation, Mr. Westgard does not provide sufficient factual information for the Court to determine whether the area at issue could actually constitute the curtilage. For example, the Court lacks information sufficient to determine whether any of the shacks could be considered a "home," since Mr. Westgard alleges only that he "camps overnight" in one of the shacks "occasionally." [Filing No. 1 at 20.] And Mr. Westgard has not provided information as to the configuration of the property, including where the shack structures stand in relation to the driveway used by Defendants and what parts of the property were visible to them. Mr. Westgard has provided no detailed descriptions, photos, schematics, or any other evidence allowing the Court to assess the configuration of the subject property and the area under inspection. Mr. Westgard did specify that Mr. Kennard drove past a "No Trespassing" sign to access the driveway, but as the Supreme Court concluded in *Oliver*, the presence of such a sign does not render legitimate a person's expectation of privacy in the subject area. *Oliver,* 444 U.S. at 179.

As described above, the concept of curtilage arose from the Fourth Amendment's enumerated protection of a person's home. And as the late Justice Scalia often expressed on behalf of the Court, "when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Jardines*, 133 S. Ct. at 1414; *see also, Kyllo,* 533 U.S. at 37 (Scalia, J.) ("In the home, our cases show, *all* details are intimate details, because the

11

entire area is held safe from prying government eyes.") (emphasis in original). As the *Jardines* court noted:

> [t]his right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window. We therefore regard the area immediately surrounding and associated with the home—what our cases call the curtilage—as part of the home itself for Fourth Amendment purposes.

*Id.* at 1414-15. Mr. Westgard simply has not presented any evidence that would allow the Court to conclude that the subject portion of property constituted curtilage, as opposed to open fields.

While Mr. Westgard argues that this case involves conduct that is "an exact repetition of the activity prohibited" in *Camara* and *See*, [Filing No. 6 at 4], he fails to recognize several key distinctions between those cases and this one. *Camara*, like this case, involved an inspection by a municipal health inspector. *Camara*, 387 U.S. at 525. In that case, however, the health officer sought to enter Camara's home without a warrant. *Id.* at 526-27. Camara refused to allow the inspector inside and was criminally charged for that refusal. *Id.* at 527. *Camara*'s circumstances differ critically from those here, because the intrusion at issue there involved the search of a person's home. As described above, the warrantless search of a home is presumptively unreasonable, unlike an intrusion into open fields, which is not a "search" at all. And in *See*, a companion case to *Camara*, the Supreme Court concluded that a warrant was required for the municipal inspection of the portions of a commercial structure that were not open to the public. *See* 387 U.S. at 545-46. The Court reasoned that "[t]he businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." *Id.* at 543. Again, however, Mr. Westgard has not alleged that this property is commercial property that is not visible to the public, so the Court cannot conclude that *See* is applicable here.

In order to succeed on the merits, Mr. Westgard bears the burden of establishing that the challenged activity constitutes a search barred by the Fourth Amendment. And he bears the burden at the preliminary injunction phase of establishing a likelihood of success on the merits. For the reasons described above, the Court concludes that Mr. Westgard has not met his burden to establish a likelihood of success on the merits.[5]

**B. Irreparable Harm and Adequacy of Remedy at Law**

Citing several cases from the District Court of the District of Columbia, Mr. Westgard contends that "[c]ontinued deprivation" of his Fourth Amendment rights is the "type of irreparable injury necessary to justify injunctive relief." [Filing No. 6 at 3.] Defendants respond that under Seventh Circuit precedent, damages can be sufficient to remedy any potential harm, and therefore that Mr. Westgard cannot demonstrate irreparable harm or an inadequate remedy at law. [Filing No. 24 at 18.]

The Seventh Circuit has concluded that money damages can be an adequate remedy for a constitutional wrong. *Campbell v. Miller*, 373 F.3d 834, 835-36 (7th Cir. 2004). In that case, the Court stated that "[d]amages are a normal, and adequate, response to an improper search or seizure, which as a constitutional tort often is analogized to (other) personal-injury litigation." *Id.* at 836. Mr. Westgard argues that his case differs substantially from *Campbell*, because that case involved

---

[5] The Court must deny Mr. Westgard's Motion because it concluded that he has failed to meet one of the threshold requirements for the issuance of a preliminary injunction. The Court is mindful, however, of the Seventh Circuit's encouragement to provide analysis as to each element of the threshold inquiry, so it addresses those in turn. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1087 (7th Cir. 2008) ("Where, as here, a district court decides that a party moving for a preliminary injunction has not satisfied one of the threshold requirements, we have encouraged the court to conduct at least a cursory examination of all the aforementioned preliminary injunction considerations. … Doing so expedites our review and helps to protect the interests of the parties.") (citations omitted).

13

circumstances in which it was unclear that the alleged constitutional wrong would be repeated against the plaintiff bringing suit. Mr. Westgard alleges that, unlike the plaintiff in *Campbell*, he is under "sustained threat of illegal entry upon his property." [Filing No. 6 at 3.]

The Court acknowledges that Mr. Westgard faces the possibility of another proposed property inspection. But this does not alter the Seventh Circuit's conclusion that, if an unlawful search occurs, money damages can provide an adequate remedy. Mr. Westgard provides no argument as to why money damages would not constitute a sufficient remedy if an illegal search were to occur. He has therefore not carried his burden to establish an irreparable injury or that he has no adequate remedy at law.

The Court only proceeds to the balancing step of the analysis if a plaintiff satisfies all requirements of the "threshold phase" for obtaining a preliminary injunction. *Girl Scouts*, 549 F.3d at 1086. Because the Court has concluded that Mr. Westgard has failed to carry his burden on all of the threshold requirements for obtaining injunctive relief, any balancing inquiry would be futile.

### IV.
#### CONCLUSION

The Seventh Circuit has emphasized that "a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Girl Scouts*, 549 F.3d at 1085. Mr. Westgard has not met his burden to show that this is such a case. For the reasons detailed herein, the Court **DENIES** the Motion for Preliminary Injunction. [Filing No. 5.]

Date: 7/12/2017

*[signature: Jane Magnus-Stinson]*

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution see attached.

14

Distribution:

THOMAS J. WESTGARD
2218 S. Knightridge Rd.
Bloomington, IN 47401

Jennifer Elizabeth Lemmon
INDIANA ATTORNEY GENERAL
jennifer.lemmon@atg.in.gov

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP-New Albany
jlowe@k-glaw.com

Parvinder Kaur Nijjar
OFFICE OF THE ATTORNEY GENERAL
parvinder.nijjar@atg.in.gov